**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| JANE DOE, | ‖ | |
| Plaintiff, | ‖ | No. 11-CV-2067-LRR |
| vs. | ‖ | **ORDER** |
| SAMMY HAGAR, | ‖ | |
| Defendant. | ‖ | |

_____

*TABLE OF CONTENTS*

*I.*    *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*   *PROCEDURAL HISTORY.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*  *SUBJECT MATTER JURISDICTION.* . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*  *SUMMARY JUDGMENT STANDARD.* . . . . . . . . . . . . . . . . . . . . . . *3*

*V.*   *RELEVANT FACTUAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . *4*

*VI.*  *ANALYSIS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*

    *A.*    *Defamation.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
        *1.*   *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
        *2.*   *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*
           *a.*   *Libel per se.* . . . . . . . . . . . . . . . . . . . . . . *14*
           *b.*   *Libel per quod.* . . . . . . . . . . . . . . . . . . . . *19*
           *c.*   *Summary.* . . . . . . . . . . . . . . . . . . . . . . . . *20*
    *B.*    *False Light Invasion of Privacy.* . . . . . . . . . . . . . . . . . . . . . . *20*
        *1.*   *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . *20*
        *2.*   *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*
    *C.*    *Intentional Infliction of Emotional Distress.* . . . . . . . . . . . . . . *23*
        *1.*   *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . *24*
        *2.*   *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*
    *D.*    *Breach of Contract.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *28*
        *1.*   *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . *29*

2.     Application. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
E.     *Breach of Implied Covenant of Good Faith and Fair Dealing.* . . . . . 30
      1.     *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      2.     *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VII.  **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## I. INTRODUCTION

The matter before the court is Defendant Sammy Hagar's "Motion for Summary Judgment" ("Motion") (docket no. 86).

## II. PROCEDURAL HISTORY

On October 5, 2011, Plaintiff Jane Doe filed a Petition ("Complaint") in the District Court for Black Hawk County, Iowa, Case No. LACV117286. Complaint (docket no. 2-1). In the Complaint, Doe alleges seven claims against Hagar: (1) breach of contract (Count I); (2) breach of covenant of good faith and fair dealing (Count II); (3) negligent infliction of emotional distress (Count III); (4) intentional infliction of emotional distress (Count IV); (5) false light invasion of privacy (Count V); (6) defamation (Count VI); and (7) punitive damages (Count VII). On October 27, 2011, Hagar removed this action to this court on the basis of diversity jurisdiction. Notice of Removal (docket no. 2). On November 29, 2011, Hagar filed an Answer (docket no. 16) to the Complaint, denying Doe's claims and asserting affirmative defenses.

On January 28, 2013, Hagar filed the Motion. On that same date, Hagar filed a Statement of Material Facts (docket no. 86-1). On February 27, 2013, Doe filed a Resistance (docket no. 109). On that same date, Doe filed a Response to Hagar's Statement of Material Facts (docket no. 109-1) and a Statement of Additional Material Facts (docket no. 109-2). On March 1, 2013, Hagar filed a Reply (docket no. 110-2). On that same date, Hagar filed a Response to Doe's Statement of Additional Material Facts (docket no. 110).

In the Motion, Hagar requests the opportunity to present oral argument. The court

finds that oral argument is unnecessary. The Motion is fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The court has diversity jurisdiction over this case because complete diversity exists between the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . .").

Doe is an individual residing in Waterloo, Iowa, and is a citizen of Iowa. Hagar is an individual residing in Marin County, California, and is a citizen of California. The parties do not dispute that the amount in controversy exceeds $75,000. Therefore, the court is satisfied that it has subject matter jurisdiction over the dispute.

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012). "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003))

(internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V. *RELEVANT FACTUAL BACKGROUND*

Viewing the evidence in the light most favorable to Doe and affording her all reasonable inferences, the uncontested material facts are as follows:

From 1982 to 1985, Doe was a Playboy bunny in Lansing, Michigan. In 1983, Doe met Hagar, a musician best known as the lead singer for Van Halen, after attending one of Hagar's concerts. Doe became acquainted with Hagar and some of Hagar's bandmates and was often invited to attend Hagar's concerts.

Doe and Hagar had a sexual relationship that began, to the best of Doe's recollection, in 1984 and was carried on intermittently through 1988. In 1985, Doe moved to New York City. In June 1988, Doe attended a Van Halen concert in Detroit, Michigan. That evening, Doe had intercourse with Hagar. Doe then became pregnant. Sometime within the three-month period after the Detroit concert, Doe called Ed Leffler, Hagar's manager, to tell him that she was pregnant and that she believed that Hagar was the father. Hagar believed that his wife would become upset if she learned about Hagar's affair with Doe and, thus, he hoped to keep the affair private. Doe's close friends and family knew about her relationship with Hagar and that Doe believed that Hagar had impregnated her.

Doe hired a lawyer who began negotiating an agreement on behalf of Doe with Hagar whereby Doe would keep the affair confidential and, in return, Hagar would pay some of Doe's living expenses. On September 27, 1988, Doe's lawyer sent a letter to Hagar proposing that Hagar's lawyer contact her so that they could negotiate an agreement and stating that, if Hagar did not respond "within a reasonable time, [Doe would] have no other option but to commence litigation." September 27, 1988 letter, Doe App'x (docket no. 109-3 through 109-12) at 359. On November 11, 1988, Hagar's counsel sent Doe a

letter enclosing a copy of the proposed agreement and indicating that Hagar would send Doe $2,000 once Doe signed the agreement. November 11, 1988 letter, Doe App'x at 374.

On February 17, 1989, Doe and Hagar entered into the Agreement. Agreement, Doe App'x at 13-23. The Agreement states that Doe is pregnant and alleges that Hagar is the father. Specifically, the Agreement included the following:

> 1. <u>Payments.</u> [Hagar] shall pay [Doe] the following monies:
>
> (a) The sum of Five Hundred ($500.00) Dollars per week commencing with the week beginning October 3, 1988, and terminating as set forth below, provided, however, that all such weekly payments thereby payable for the period commencing October 3, 1988 until the date hereof are being paid simultaneously with the execution of this Agreement and the receipt of such payment is hereby acknowledged by [Doe]. The weekly payments due prospectively hereunder shall commence on the execution of this Agreement . . . . Such weekly payments shall terminate upon the occurrence of the earliest of any of the following: (i) the issuance by the laboratory of the results of the four (4) Tests to be performed under Paragraph 4 hereof; (ii) six (6) months after the date of the birth of the Prospective Child, with such birth, and date thereof, to be confirmed to [Hagar] by notice to him to such effect within 10 days after such birth; (iii) a miscarriage; (iv) a stillbirth; (v) any other termination of [Doe's] pregnancy; or (vi) any further disclosure, as referred to in Paragraph 3 hereof, that [Hagar] is the father of the Prospective Child.
>
> (b) The sum of Three Thousand Seven Hundred ($3,700) Dollars representing the balance of [Doe's] physician's fee for medical services through the delivery of the Prospective Child . . . .
>
> . . . .
>
> (c) The sum of Two Thousand ($2,000) Dollars which

5

represents payment in full for [Doe's] legal fee expenses in connection with [Doe's] representation regarding the negotiation and consummation of this Agreement and any related agreement(s) up to the time of the birth of the Prospective Child . . . .

. . . .

### 3. Non-disclosure.

(a) [Doe] covenants and agrees that she will not disclose, or cause, directly or indirectly any other party to disclose, beyond the disclosure referred to in subpart (c) of this Paragraph, her belief that [Hagar] is the father of the Prospective Child until the earliest of the following events:

i) The results of the Tests have been received.

ii) 33 weeks after the birth of the Prospective Child, whether or not the Test results have been received and/or whether the Tests were taken; provided that [Doe] has not refused to submit to the Tests . . . in which event [Doe's] obligation not to disclose shall continue until [Doe] may submit to the Tests; further, provided, however, in the event the Prospective Child is not submitted for the Tests within said 33 week period on account of the Prospective Child's medical ineligibility therefor (as may be determined by the Prospective Child's pediatrician), then, in such event, [Hagar] shall have the right to elect to continue [Doe's] covenant of non-disclosure hereunder until the results of the Tests have been received, by giving notice to [Doe] of such election, and by continuing to make the weekly payments hereunder (i.e., $500 per week) until the Test[] results have been received.

iii) Any termination of support payments under this Agreement, including, but not limited to, termination of support for disclosure or alleged disclosure by [Doe].

(b) Notwithstanding the foregoing, in the event of a miscarriage, stillbirth, or other termination of [Doe's]

pregnancy with the Prospective Child, [Doe's] covenant not to disclose her belief that [Hagar] was the father of the Prospective Child shall then continue in perpetuity.

(c) [Doe] further represents that to date the sole disclosure she has made of her belief that [Hagar] is the father of the Prospective Child is to her parents, siblings, certain friends at her former place of employment, other close friends, and her niece and nephew, and her attorney or attorneys in connection with this matter, and she shall use her best efforts to assure no further said disclosure shall be made by these persons.

(d)  In the event there is any further disclosure of [Doe's] belief that [Hagar] is the father of the Prospective Child, beyond that referred to in subpart (c) of this Paragraph, and excluding any disclosure of said belief to [Hagar's] attorne[ys] or business manager or any further such disclosure which is attributable, directly or indirectly to [Hagar], [Hagar] shall then have the right to terminate weekly payments for any payments accruing under this Agreement after notification to [Doe's] attorney of said disclosure and the place where said disclosure appeared or was stated, provided, however, that upon any such termination, [Doe] shall have all rights, in law or equity, to seek any and all relief available to her in any court of competent jurisdiction to establish paternity of the Prospective Child and support for the Prospective Child and herself as if this Agreement had never been entered into.

(e)  [Hagar's] sole remedy for any breach by [Doe] of her covenant of non-disclosure as provided in this Paragraph . . . , shall be to terminate the weekly support payments under this Agreement for any payments accruing after notification to [Doe's] attorney of said disclosure as set forth in subpart (d) of this Paragraph.

. . . .

7.  Confidentiality.  This Agreement and the terms thereof are deemed by the parties to be confidential and [Doe] and [Hagar] each further agree that they shall not cause or permit this

> Agreement to be disclosed to any other party, except in the enforcement of this Agreement in a court of competent jurisdiction. Notwithstanding anything else stated hereunder, [Doe] may also explain in any court of competent jurisdiction that her failure to make any further disclosure subsequent to the execution of this Agreement was based on an agreement between [Doe] and [Hagar] providing for limited non-disclosure.
>
> 8. <u>Entire Agreement</u>. This Agreement represents the entire understanding of the parties with respect to the subject matter contained herein and as such may not be modified or altered in any manner except in a writing signed by both parties hereto.

Agreement, Doe App'x at 14-19, 21.

On February 27, 1989, Doe gave birth to Dylan Reed Doe. Dylan died on March 4, 1989. No paternity tests were ever performed. On April 5, 1989, Doe sent Hagar a letter indicating that she had complied with the terms of the Agreement and acknowledging receipt of a $7,000 payment from Hagar in consideration of the Agreement. April 5, 1989 letter, Doe App'x at 401.

In March 2011, Hagar released his autobiography, *Red: My Uncensored Life in Rock* ("*Red*"). On pages 116 through 117 of *Red*, Hagar tells his account of his interactions with Doe:

> On the tour, there was a former Playboy bunny from California hanging around, who used to see one of the other guys in my old band. Somehow she hooked up with Leffler, although she had always been after me. She was good-looking, but there was just something about this chick that was not to be trusted. She saw my name on Leffler's rooming list and came knocking at my door in the middle of the night in Detroit. I answered the door without any clothes—I sleep naked—and she pushes the door open, throws me on the bed, and starts blowing me. That's kind of tough to get up and walk away from. "Son of a bitch," I was thinking, "I'm fucked now." And sure enough, I was.

About ten days later, Leffler gets the phone call. She's pregnant. I smelled a setup. I was so pissed off. Betsy would commit suicide. We hired an attorney and started dealing with her. I knew it was not my baby. It was extortion.

She wanted an apartment in New York and anything for that kid that my children would have. I didn't want to pay a penny, but Leffler convinced me the smart thing to do was give her the money until the baby was born and see what happened at that point. She was living with her boyfriend, a musician in New York, in the apartment when she had the baby. She called Leffler from the hospital. "Tell Sammy to call me," she said. I didn't want to talk to her, but Leffler talked me into it. She tells me the baby is so cute, looks just like me, she's madly in love with me, she's so sorry, shit like that.

A couple days later, Leffler gets another call. The baby died. I don't believe that she ever had a baby. She may have had an abortion early on. Marshall Lever, my psychic with the sleeping dog, told me about it. "It's not your baby," he said. "She's living with her boyfriend in New York. She has a boyfriend that's a musician and this is probably an extortion case. Don't worry, just relax, and once she has the baby, it's all going to go away."

I never heard from her again. Obviously, it wasn't my baby, and they knew it. They just extorted me as long as they could. No one ever saw her again.

*Red* excerpt, Doe App'x at 362-63. Hagar does not refer to Doe by name in *Red* and does not provide dates for when the interactions took place. Further, Hagar describes Doe as "a former Playboy bunny from California." *Id*. at 362. Doe is not from California.

Doe told some of her close family and friends that *Red* discussed her relationship with Hagar. In addition, Doe stated that she believed that "Pam Fisher, Shari Kniep, Tammy Shepard, Philip Kniep, Jim Shepard, Linda Prichkaitis, Cicilia Liptay, Francine

Rozich, Lynette Daniels, Joscelynne Bordeaux, and Marsha Kobliska all understood that pages 116-117 of *Red* referred to [Doe]." Doe's Second Supplemental Answers to Hagar's First Set of Interrogatories, Hagar App'x (docket no. 86-2) at 218. In addition, Doe listed forty-one individuals[1] who "have been informed that . . . Hagar is the father of Dylan." Doe's Answers to Hagar's First Set of Interrogatories, Hagar App'x at 225-26.

## VI. ANALYSIS

The court will consider each of Doe's remaining claims in the Complaint[2] and determine whether summary judgment in favor of Hagar is appropriate as to each claim. The court notes that it does not address the claims in the order that they are listed in the Complaint.

The court will apply Iowa law to Doe's defamation, false light invasion of privacy and intentional infliction of emotional distress claims. *See Hammonds v. Hartford Fire Ins. Co.*, 501 F.3d 991, 996 n.6 (8th Cir. 2007) ("[A] district court sitting in diversity applies the substantive law of the state in which it is located." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))). The court will apply New York law to Doe's breach of contract and breach of implied covenant of good faith and fair dealing claims, pursuant to

---

[1] The court notes that the number of individuals who have been informed that Hagar is the father of Dylan is higher than forty-one because the list states "& their children" next to two couples. Doe's Answers to Hagar's First Set of Interrogatories, Hagar App'x at 225. The court did not add in any individuals to account for such children.

[2] In her Resistance, Doe states that "[d]iscovery has shown that . . . Hagar acted intentionally, not negligently, in inflicting distress on . . . Doe. Thus, Count III is waived." Resistance at 30 n. 23. In light of Doe's waiver of Count III, the court shall dismiss Count III and will not address Hagar's request for summary judgment in his favor with respect to Count III. In addition, the court will not address Doe's claim for punitive damages (Count VII).

the choice-of-law provision in the Agreement.[3]  *See John T. Jones Constr. Co. v. Hoot Gen. Constr. Co.*, 613 F.3d 778, 783 (8th Cir. 2010) ("Once the existence of a contract is determined, the parties' intent as evinced in the choice-of-law provision controls, and [the court] will apply [the law of the forum chosen by the parties] to questions of interpretation or construction of the contract." (citation omitted)).

## A. Defamation

In Count VI of the Complaint, Doe alleges that Hagar's "false statements concerning . . . Doe are defamatory and have held her up to ridicule and scorn in a respectable segment of the community, namely, those persons . . . who knew of [Doe's] past relationship with . . . Hagar." Complaint ¶ 42.  In the Brief in Support of the Motion, Hagar argues that the court should grant summary judgment in his favor with respect to Count VI.  Specifically, Hagar alleges that Doe has not suffered an injury, Hagar's statements in *Red* are not defamatory, the statements were not published, the statements are substantially true and the statements are opinion.  Doe counters that summary judgment is not appropriate because the statements qualify as libel per se and, therefore, her claim does not require proof of injury; the statements were published; the statements are provably false and the statements are not opinion.

### 1.    Applicable law

The Iowa Supreme Court has explained that "[d]efamation includes the twin torts of libel and slander.  Libel involves written statements, while slander involves oral statements." *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) (citation omitted). Under Iowa law, libel is defined as "'malicious publication, expressed either in printing or in writing, . . . tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance

---

[3] The Agreement states that it "shall be construed, interpreted and governed by the laws of the State of New York."  Agreement, Doe App'x at 22.

of [the person's] business.'" *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115 (Iowa 1984) (alterations in original) (quoting *Plendl v. Beuttler*, 111 N.W.2d 669, 670-71 (Iowa 1961)).

"To establish a prima facie case of libel, the plaintiff must show the defendant: '(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff.'" *Kiesau*, 686 N.W.2d at 175 (quoting *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996)). Iowa courts have held that the plaintiff's repetition of allegedly defamatory statements does not qualify as "publication." *See, e.g., Belcher v. Little*, 315 N.W.2d 734, 737 (Iowa 1982) (holding that the plaintiff's repetition of the defamatory statements did not constitute publication).

In addition, Iowa courts have held that a statement may be "of and concerning the plaintiff" even if the statement does not refer to the plaintiff by name. *See, e.g., Bierman v. Weier*, 826 N.W.2d 436, 464 (Iowa 2013) ("[T]his element only requires that a third-party recipient be able to understand who is the intended subject."); *Shaw Cleaners & Dyers, Inc. v. Des Moines Dress Club*, 245 N.W. 231, 234 (Iowa 1932) (providing that, when a plaintiff alleged that a newspaper advertisement contained libelous statements, the fact "that [the plaintiff] [was] not named in the [advertisement] is immaterial" when an individual who regularly read the newspaper would understand that the statements referred to the plaintiff). "Of course, it is not necessary to constitute a libel that the article name the person libeled, but it must by inference or innuendo at least refer in an intelligent way to the person libeled." *Boardman & Cartwright v. Gazette Co.*, 281 N.W. 118, 120 (Iowa 1938) (finding that an article was not libelous when it made no mention "of the plaintiffs by name and no inference or innuendo seem[ed] to connect them with any alleged wrong doing or lack of duty or unprofessional and unethical conduct"); *see also Brummett v. Taylor*, 569 F.3d 890, 892 (8th Cir. 2009) (affirming the district court's grant of summary judgment, which applied Iowa law to the underlying defamation action, when the district

court found that, "[w]hile the record is clear that plaintiffs were among those *intended* to be the object of [the defendant's] statements, there is no evidence to support a finding that the recipients of [the defendant's] publication *understood* each individual plaintiff to be the intended object of [the defendant's] statements"); Restatement (Second) of Torts § 564 cmt. a ("It is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff.").

With respect to the injury requirement, the Iowa Supreme Court has stated that, in order "[t]o recover in an action for defamation, a plaintiff must ordinarily prove some sort of cognizable injury, such as injury to reputation." *Johnson*, 542 N.W.2d at 513. "Hurt feelings alone cannot serve as the basis of a defamation action." *Id.* "[I]f no harm can be established[,] the [defamation] action must be regarded as trivial in nature." *Id.* (upholding the lower court's grant of summary judgment in favor of the defendant in a defamation action when the plaintiff could not prove injury). In addition, with respect to the publication requirement, the Iowa Supreme Court has held that "[t]he defamed party has not suffered injury until someone other than [her]self learns of the defamation. The injured party cannot create [her] own cause of action by communicating the [libelous] statements to others unless under strong compulsion to do so." *Belcher*, 315 N.W.2d at 737-38.

Iowa courts recognize "two types of libel: libel per se and libel per quod." *Schlegel v. Ottumwa Courier, A Div. of Lee Enters., Inc.*, 585 N.W.2d 217, 222 (Iowa 1998).[4] "A statement is libelous per se if it has 'a natural tendency to provoke the plaintiff to wrath or expose him [or her] to public hatred, contempt, or ridicule, or to deprive him [or her] of the benefit of public confidence or social intercourse.'" *Johnson*, 542 N.W.2d at 510

---

[4] The court notes that the Iowa Supreme Court recently upheld the doctrine of libel per se as it applies to private plaintiffs in suits against nonmedia defendants for defamatory statements that do not involve a matter of public concern. *Bierman*, 826 N.W.2d at 458-59.

(quoting *Prewitt v. Wilson*, 103 N.W. 365, 367 (Iowa 1905)). Statements are libelous per se and, therefore, actionable without proof of malice, falsity or injury if they are "of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have a libelous effect." *Vinson*, 360 N.W.2d at 115-16 (citing *Haas v. Evening Democrat Co.*, 107 N.W.2d 444, 447 (Iowa 1961)). Thus, when statements are libelous per se, a jury may "award substantial damages without the necessity of the plaintiff proving actual damage to reputation." *Schlegel*, 585 N.W.2d at 222. "In case of statements that are libelous per se, damages for mental anguish or hurt feelings are allowed because damage to reputation is presumed." *Id.*; *see also Sawheny v. Pioneer Hi-Bred Int'l Inc.*, 93 F.3d 1401, (8th Cir. 1996) ("Under Iowa law . . . [a]ttacking the integrity and moral character of a party constitutes libel per se."); *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996) ("To accuse a person of an indictable crime is defamation per se."); *Spencer v. Spencer*, 479 N.W.2d 293, 296 (Iowa 1991) (finding that publishing statements accusing someone of "being a liar, a cheater, or thief" qualifies as libel per se); *Overstreet v. New Nonpareil Co.*, 167 N.W. 669, 672 (Iowa 1918) (finding that publishing statements that a person is untrustworthy, a hypocrite and a traitor in his employment qualifies as libel per se).

Libel per quod, on the other hand, "simply means that one must refer to facts or circumstances beyond the words actually used to establish the defamation." *Schlegel*, 585 N.W.2d at 222. In a case where statements are libelous per quod, "a plaintiff must first prove actual damage to reputation before the plaintiff can recover for mental anguish or hurt feelings." *Id.*

### 2.    *Application*

#### a.    *Libel per se*

Hagar argues that the statements are not libelous per se because the statements do not name Doe specifically and "Doe must introduce extrinsic evidence to show that the

paragraphs are 'of and concerning' her." Brief in Support of Motion (docket no. 86-3) at 16. According to Hagar, the statements have no "natural tendency to provoke [Doe] to wrath or expose [her] to public hatred, contempt, or ridicule, or to deprive [her] of the benefit of public confidence or social intercourse," *id.* at 15 (quoting *Schlegel*, 585 N.W.2d at 222) (internal quotation mark omitted), because the only individuals who would recognize Doe as the woman described in *Red* "already knew the facts and rejected Hagar's account when Doe presented it to them," *id.* Rather, Hagar alleges that, if anything, the statements qualify as libel per quod because "extrinsic evidence is necessary to prove the defamation." *Id.* at 15-16.

Doe alleges that Hagar's allegedly libelous statements accuse her of extortion and depict her as interested only in sex and money and, thus, qualify as libel per se. Doe claims that, because Hagar "presumably impregnated only one former Playboy bunny, . . . everybody who knew . . . Doe during this time and who knew about the affair with . . . Hagar can recognize her in the book." Resistance at 4 (emphasis omitted). Doe further claims that "there is no requirement whatsoever that the plaintiff actually be named, or even that individuals within the community knew that he or she was the person named." *Id.* at 18. Doe argues that the court may apply "the libel per se doctrine to the words in question even though [Doe] was not specifically named in the relevant passage." *Id.* at 19.

Calling a person an extortionist may be libelous per se. *See Sawheny*, 93 F.3d at 1410 ("Attacking the integrity and moral character of a party constitutes libel per se."). However, a statement that is libelous per se must be libelous on its face. Am. Jur. *Libel* § 145 (2013). "A statement is not libelous on its face if the defamatory meaning would appear only to readers who might be able to recognize it through some knowledge of specific facts and/or circumstances, not discernable from the face of the publication, and which are not matters of common knowledge rationally attributable to all reasonable persons." *Id.* Thus, the court finds that a libel per se claim cannot stand where the

statements do not refer to the person by name and do not include any unique identifying information.

Doe relies on numerous cases that she claims support her argument. First, Doe cites *Morse v. Times-Republican Printing Co.*, 100 N.W. 867 (Iowa 1904). In *Morse*, the newspaper-defendant, which published allegedly libelous statements about the plaintiff, used the plaintiff's name several times, making it clear to anyone reading the newspaper who the article referred to. *Id.* at 868. The Iowa Supreme Court stated that, when the statements at issue are libelous per se, "[a]ll the plaintiff is required to prove is the publication itself and his own identity as the person thus assailed." *Id.* at 871. However, the Court had already established that the statements, which clearly and repeatedly identified the plaintiff by name, were libelous per se. *Id.* at 869-70. Thus, *Morse* does not support Doe's argument that the court should find that the statements concerning Doe in *Red* are libelous per se when Doe's name is not used and the statements do not make it clear that they refer to Doe in any other way, unless the reader knew of the relationship between Doe and Hagar prior to reading *Red*.

Doe also relies on the Iowa Supreme Court's analysis in *Bierman* to support her argument that the statements at issue are libelous per se. In *Bierman*, the plaintiffs, the defendant's ex-wife and his ex-wife's father, brought a libel action against the defendant after he wrote and published a memoir, which allegedly contained libelous statements about the plaintiffs. *Bierman*, 826 N.W.2d at 440. Although the allegedly libelous passages in the memoir did not include the plaintiffs' names, the Iowa Supreme Court affirmed the lower court's denial of the defendant's motion for summary judgment with respect to the plaintiffs' libel per se claim. *Id.* at 464-65. However, one of the passages at issue, on page twenty of the memoir, referred to "'two women we spoke of earlier.'" *Id.* at 465. The Iowa Supreme Court stated that:

> In the preceding nineteen pages, only two women are discussed—[the defendant's] ex-wife and a woman who

> became pregnant and claimed [the defendant] was the father.
> . . . [I]t does not take speculation or guesswork to put two and
> two together. Other statements that are the subject of the
> lawsuit clearly refer to [the defendant's] "ex" or "ex-wife."
> Accordingly, the district court [appropriately found that there
> was a genuine issue of material fact] as to whether the
> challenged statements were "of and concerning" [the plaintiff].

*Id.* In *Bierman*, even though the allegedly libelous passages did not refer to the plaintiffs by name, the context made it clear that the passages referred to the defendant's ex-wife without requiring any "speculation or guesswork" from the reader. *Id.* Thus, *Bierman* is distinguishable from the instant action because *Red* does not provide any context indicating that the allegedly libelous statements refer to Doe and does not refer to Doe outside of the five paragraphs at issue. A reader would only understand that such statements refer to Doe if the reader had independent knowledge of the situation between Doe and Hagar.

Finally, Doe argues that the Iowa Supreme Court's holding in *Shaw Cleaners & Dyers* supports her argument that the statements at issue are libelous per se. The allegedly libelous statements in *Shaw Cleaners & Dyers* were printed in a dry cleaner's newspaper advertisement, which stated "Garments Cleaned at Half-Price are only Half Cleaned . . . Don't be misled by half-price cleaning." *Shaw Cleaners & Dryers*, 245 N.W. at 232 (internal quotation marks omitted). Over the course of several weeks prior to the defendant running the advertisement at issue, the plaintiff, a competing dry cleaner, ran an advertisement in the same newspaper that stated "half price for the 2nd. garment." *Id.* (internal quotation marks omitted). The Iowa Supreme Court ultimately held that the statements were not libelous. *Id.* at 235. However, in dicta, the Court stated that "the mere fact that [the plaintiff] is not named in the published article is immaterial." *Id.* at 234. An individual who read the newspaper during the weeks prior to the advertisement at issue would be able to conclude, without speculation, that the advertisement referred to the plaintiff's dry cleaning company. *See id.* (citing *Overstreet*, 167 N.W. at 672 (finding

that, where the plaintiff alleged that the defendant published libelous statements about the plaintiff in a newspaper, although the statements at issue did not refer to the plaintiff by name, "[a] person reading the entire matter . . . might connect the discussion to and reasonably infer that it referred to [the plaintiff]")).  Thus, *Shaw Cleaners & Dyers* is distinguishable from the instant matter because, in this case, an individual who read the entirety of *Red* would not understand the statements at issue to refer to Doe unless the reader already knew of the relationship between Doe and Hagar.  Further, *Shaw Cleaners & Dyers* provides that a plaintiff may have a defamation claim when the plaintiff is not explicitly named, not a libel per se claim.

Thus, Doe does not provide the court with any legal authority, and the court is aware of none, that supports a finding that the statements at issue may qualify as libel per se when such statements do not refer to Doe by name and, in order to understand that the statements refer to Doe, the reader must have additional information concerning Doe and Hagar's relationship.  Although, as Doe correctly points out, a libel claim may stand even when extrinsic facts are required to show that the statements are of and concerning Doe, such statements must "unambiguously tend[] to provoke [Doe] to wrath or expose [her] to public hatred, contempt, or ridicule" to be libelous per se.  *Bierman*, 826 N.W.2d at 464 (quoting *Johnson*, 542 N.W.2d at 510) (internal quotation marks omitted).  The court finds that the statements concerning Doe in *Red* do not have "a natural tendency to provoke [Doe] to wrath or expose [her] to public hatred, contempt, or ridicule, or to deprive [her] of the benefit of public confidence or social intercourse," *Johnson*, 542 N.W.2d at 510 (quoting *Prewitt*, 103 N.W. at 367) (internal quotation marks omitted), because a reader would have no way of knowing that the statements refer to Doe unless the reader had knowledge of the situation between Doe and Hagar prior to reading *Red*.  Thus, the court cannot "presume as a matter of law that their publication will have a libelous effect." *Vinson*, 360 N.W.2d at 116.  If anything, the statements at issue are libelous per quod, which "simply means that one must refer to facts or circumstances beyond the words

actually used to establish the defamation." *Schlegel*, 585 N.W.2d at 222. Such is the case in the instant matter.

Based on the foregoing, the court finds that the statements at issue are not libelous per se because the statements do not, on their own, injure Doe's reputation. That is, in order to understand that the relevant passage in *Red* refers to Doe, a reader would have to "refer to facts or circumstances beyond the words actually used" in *Red*. *Id*. Therefore, a libel per se claim cannot stand.

### b.     *Libel per quod*

Having determined that the statements are not libelous per se, the court next turns to consider whether the statements are libelous per quod. The court notes that Doe argues that the alleged libelous statements constitute libel per se and, thus, she argues she may assert her claim without showing injury. However, because, as the court has already determined, the statements are not libelous per se, Doe must show that she suffered a cognizable injury in order to allege a prima facie case of libel pursuant to the doctrine of libel per quod. *See Kiesau*, 686 N.W.2d at 175. The court finds that Doe has failed to show that she suffered an injury as a result of Hagar's allegedly libelous statements and, thus, a libel per quod claim cannot stand.

Doe does not allege any financial damages and does not show any injury to her reputation. In addition, in her deposition, Doe could not identify anyone who "thinks less" of her because of the statements referencing her in *Red*. Doe deposition, Hagar App'x at 59-60. Further, the court cannot conceive of how Doe could claim to have suffered an injury to her reputation due to the statements referencing her in *Red* because the only individuals who could have understood that the statements in *Red* refer to Doe had to have already known of the relationship between Doe and Hagar, and such knowledge likely came from Doe herself. Thus, the court finds that Doe has failed to show that she suffered a cognizable injury due to the allegedly libelous statements.

### c.    Summary

Based on the foregoing, the court finds that there is no genuine issue of material fact as to whether the statements referencing Doe in *Red* support a defamation claim. The court finds that Doe's defamation claim fails because (1) the statements are not libelous per se because neither the statements themselves nor *Red* as a whole clearly refer to Doe and, thus, extrinsic evidence is necessary to make such a showing; and (2) Doe has failed to properly allege a libel per quod claim because she has not shown that she suffered an injury as a result of the statements. Because the court finds summary judgment with respect to Count VI appropriate on these grounds, the court finds it unnecessary to address Hagar's alternative arguments that the statements were not published, are opinion and are substantially true. Accordingly, the court shall grant the Motion to the extent it requests that the court grant summary judgment in Hagar's favor on Count VI.

## B.   False Light Invasion of Privacy

In Count V of the Complaint, Doe claims that "Hagar published the false statements about . . . Doe with actual malice, placing her in a false light that was highly offensive, within the community of people who knew about . . . Doe's relationship with . . . Hagar and the birth and death of Dylan." Complaint ¶ 39. In the Brief in Support of the Motion, Hagar argues that the court should grant summary judgment in his favor with respect to Count V because "Doe claims disclosure only to the small group she says believed the paragraphs referred to her" and, thus, Doe "cannot show the required 'publicity'" for a false light claim. Brief in Support of Motion at 28. Doe argues that her false light claim satisfies the publicity element because *Red* has sold hundreds of thousands of copies.

### 1.    Applicable law

The Iowa Supreme Court first recognized the tort of invasion of privacy in *Bremmer v. Journal-Tribune Publishing Co.*, 76 N.W.2d 762, 764-65 (Iowa 1956). Since *Bremmer*, the Iowa Supreme Court has adopted and applied the invasion of privacy principles articulated in the Restatement (Second) of Torts. *See In re Marriage of Tigges*, 758

N.W.2d 824, 829 (Iowa 2008); *Stessman v. Am. Black Hawk Broad. Co.*, 416 N.W.2d 685, 686 (Iowa 1987); *Lamberto v. Brown*, 326 N.W.2d 305, 309 (Iowa 1982); *Anderson v. Low Rent Hous. Comm'n of Muscatine*, 304 N.W.2d 239, 248 (Iowa 1981). A false light invasion of privacy claim is one of "four distinct wrongs" comprising the common law tort of invasion of privacy. *Anderson*, 304 N.W.2d at 248. A false light claim "is predicated upon an untruthful publication which places a person before the public in a manner that would be highly offensive to a reasonable person." *Id.* The Iowa Supreme Court has held:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Winegard v. Larsen*, 260 N.W.2d 816, 823 (Iowa 1977) (quoting Restatement (Second) of Torts § 652E) (noting that such a claim "overlaps the law of defamation").

"The essential element of untruthfulness differentiates 'false light' from the other forms of invasion of privacy and many times affords an alternate remedy for defamation even though it is not necessary for a plaintiff to prove that he or she was defamed." *Anderson*, 304 N.W.2d at 248. A plaintiff "may recover under either defamation or false light but not both causes of action." *Bradbery v. Dubuque Cnty.*, No. 99-1881, 2001 WL 23144, at *4 (Iowa Ct. App. Jan. 10, 2001); *see also Berry v. Nat'l Broad. Co.*, 480 F.2d 428, 431 (8th Cir. 1973) (stating that a plaintiff "may lay his action in [theories of false light and defamation], but will be limited to only one recovery").

With respect to the "publicity" requirement of a false light invasion of privacy claim, the Restatement (Second) of Torts provides that publicity "means that the matter is

made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a; *see also id.* § 652E cmt. a (noting that the definition of publicity found in § 652D cmt. a applies). "Thus it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Id.* § 652D cmt. a; *see also Yoder v. Smith*, 112 N.W.2d 862, 864 (Iowa 1962) (holding that, when the defendant sent letters to the plaintiff's employer that included false statements pertaining to the plaintiff's debts, the plaintiff did not have an invasion of privacy claim because the communication was not to the general public); 62A Am. Jur. 2d *Privacy* § 141 (2013) ("[I]n actions for false-light invasion of privacy, the requirement of 'publicity' consists of communication to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.").

### 2. Application

As Doe states in the Complaint, Hagar's statements concerning Doe in *Red* placed her in a false light, if at all, "within the community of people who knew about . . . Doe's relationship with . . . Hagar and the birth and death of Dylan." Complaint ¶ 39. In her Resistance, Doe relies on the Iowa Supreme Court's holding in *Bierman* to support her false light claim. In *Bierman*, the Iowa Supreme Court held that there was a genuine issue of material fact regarding whether the plaintiffs satisfied the publication requirement of their false light invasion of privacy claim regarding allegedly defamatory statements in the defendant's memoir when "[a]pproximately twenty to thirty copies of the book were distributed," the defendant had "attempted to market the book for sale at local businesses" and the defendant had promoted the book on television. *Bierman*, 826 N.W.2d at 466.

The court recognizes that *Red* has sold hundreds of thousands of copies. However, as discussed above, the only individuals who would understand that the statements in *Red* refer to Doe are those who already had knowledge of the relationship between Doe and

Hagar.  *Cf. Bernstein v. Nat'l Broad. Co.*, 129 F. Supp. 817, 834 (D.C.D.C. 1955) (finding that "in invasion of privacy, where defendant has published facts in such a way that there has been no disclosure to persons not already aware of them," such disclosure is not sufficient to satisfy the publicity requirement of an invasion of privacy claim), *aff'd*, 232 F.2d 369 (D.C. Cir. 1956).  The court therefore finds that the number of copies of *Red* that have been sold is not dispositive of publicity.

Thus, the instant matter is distinguishable from *Bierman* because the only individuals to whom the allegedly defamatory statements were published are those who already knew of the relationship between Doe and Hagar, not everyone who read *Red*.  In *Bierman*, however, anyone who read the memoir could understand that the allegedly defamatory statements referred to the plaintiffs.  *See Bierman*, 826 N.W.2d at 465 (providing that any reader of the memoir could conclude that the allegedly defamatory statements referred to the plaintiff without "speculation or guesswork").

The court finds that the disclosure of the allegedly false statements to individuals already aware of the relationship between Doe and Hagar does not satisfy the "publicity" requirement of Doe's false light invasion of privacy claim because the general public will not know that the statements are about Doe and, thus, the false statements cannot "be regarded as substantially certain to become . . . public knowledge."  Restatement (Second) of Torts § 652D cmt. a.  Accordingly, the court shall grant the Motion to the extent it requests that the court grant summary judgment in Hagar's favor on Count V.

### C.  Intentional Infliction of Emotional Distress

In Count IV of the Complaint, Doe alleges that "Hagar's publication of the statements was done intentionally or with reckless disregard for the certain devastating emotional impact his doing so would have on . . . Doe."  Complaint ¶ 35.  Doe further claims that Hagar's conduct was "extreme, outrageous, beyond the standards of civilized decency, and utterly intolerable" and that Hagar's conduct proximately caused Doe to suffer damages, "including distressful mental reactions and anguish, and severe emotional

distress, with attendant physical manifestations of harm." *Id.* ¶¶ 36-37.

In the Brief in Support of the Motion, Hagar argues that the court should grant summary judgment in his favor with respect to Count IV because Doe's intentional infliction of emotional distress claim "fail[s] with the defamation claim" because a showing of reputational harm is a prerequisite for an intentional infliction of emotional distress claim. Brief in Support of Motion at 26. In addition, Hagar argues that the court should grant summary judgment because Hagar's conduct was not sufficiently "outrageous " and Doe has not shown that she suffered physical harm or severe or extreme emotional distress. *Id.* Doe counters that her pleadings are sufficient to establish a genuine issue of material fact with respect to Count IV.

### 1. *Applicable law*

Under Iowa law, a plaintiff must show the following elements in order to allege a claim for intentional infliction of emotional distress: (1) outrageous conduct by the defendant; (2) the defendant intentionally caused or acted in reckless disregard of the probability of causing emotional distress; (3) the plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the plaintiff's emotional distress. *Vinson*, 360 N.W.2d at 118. "It is for the court to determine in the first instance whether the relevant conduct may reasonably be regarded as outrageous." *Id.*; *see also Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983) ("'It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . .'" (quoting Restatement (Second) of Torts § 46 cmt. h)).

"For conduct to be 'outrageous' it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Suntken v. Den Ouden*, 548 N.W.2d 164, 168 (Iowa Ct. App. 1996) (quoting *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984)); *see also Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996) (stating that, to qualify as

outrageous, "the conduct must be extremely egregious; mere insult, bad manners, or hurt feelings are insufficient"). "Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although 'major outrage' is always the crucial element of the tort." *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) (quoting Restatement (Second) of Torts § 46 cmt. f) (finding that there was no genuine issue of material fact on the plaintiff's intentional infliction of emotional distress claim when members of a law practice notified a partner who suffered from a period of mental illness that he could not return to the practice without further review by the partners).

"[S]ubstantial evidence of such extreme conduct" is required to show that the conduct is "outrageous." *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990). With respect to what evidence is necessary to prove outrageous conduct, the Iowa Supreme Court has stated:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against . . . the actor, and lead him to exclaim, "Outrageous!"

*Roalson*, 334 N.W.2d at 756 (quoting Restatement (Second) of Torts § 46 cmt. d); *see also Engstrom v. State*, 461 N.W.2d 309, 320 (Iowa 1990) (holding that social workers' negligence in failing to search for the plaintiffs' adopted daughter's biological father before placing her in the plaintiffs' home and telling adoptive parents that the adopted daughter's father was dead without verifying his death was not outrageous); *Vinson*, 360 N.W.2d at

119 (holding that, although "a jury could find defendants engaged in a deliberate campaign to badger and harass plaintiff, . . . their conduct [does not] rise[] to the level of extremity essential to support a finding of outrageousness").

"It is for the court to determine whether on the evidence severe emotional distress can be found . . . ." Restatement (Second) of Torts § 46 cmt. j. An intentional infliction of emotional distress claim requires proof that the plaintiff suffered "severe or extreme emotional distress," which was caused "by the defendant's outrageous conduct." *Vinson*, 360 N.W.2d at 118. This requires the plaintiff to "present more evidence than he or she just felt bad for a period of time; plaintiff must prove that he or she suffered extremely unpleasant mental reactions." *Steckelberg v. Randolph*, 448 N.W.2d 458, 461-62 (Iowa 1989) (noting that cases where the Iowa Supreme Court found "substantial evidence of emotional harm have had direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct"). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Restatement (Second) of Torts § 46 cmt. j; *see also Bethards v. Shivvers, Inc.*, 355 N.W.2d 39, 44-45 (Iowa 1984) (finding that the record lacked substantial evidence that the plaintiffs suffered severe emotional distress when the plaintiffs had shown that they were angry, lost sleep, quivered and worried about reputational damage).

In addition, a plaintiff must show that the emotional distress suffered stemmed from the defendant's outrageous conduct rather than from a preexisting condition. *See Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 794-95 (Iowa 2009) (finding that the plaintiff failed to present substantial evidence showing that his emotional distress was caused by his employer's unauthorized release of his mental health records because the plaintiff "merely relied on conclusory statements to support his claim" and "[t]he jury had no basis upon which to determine if [the plaintiff's] emotional distress was caused by the unauthorized disclosures of the records or by [the plaintiff's] preexisting condition").

## 2.    *Application*

In support of her argument that Hagar's conduct was "outrageous" enough to support her intentional infliction of emotional distress claim, Doe relies on the Iowa Supreme Court's holding in *Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976).  In *Meyer*, the plaintiff brought an intentional infliction of emotional distress claim against a mortician who dealt with the plaintiff's father's body after his death and undertook services and duties incident to the plaintiff's father's funeral and burial.  *Id.* at 914.  The plaintiff alleged that: (1) the defendant misadvised the plaintiff that his father's wife died after his father, in order to induce the plaintiff "to retain only the [d]efendant to undertake the services and duties incident to the funeral and burial"; (2) the defendant misadvised the plaintiff that his father's body had an "objectionable odor" requiring a more expensive casket; (3) the defendant misadvised the plaintiff that he and his family could not view the body; and (4) the defendant allowed the procession to proceed without the plaintiff's presence, contrary to the plaintiff's instruction to the defendant.  *Id.* at 917.

It appears that Doe is arguing that *Meyer* is comparable to the underlying matter because "the words or actions occurred in connection with the death of a close relative." in her case, her son Dylan, and in *Meyer*, the plaintiff's father.  Resistance at 31.  Doe further alleges that Hagar's conduct was "far more outrageous" than that of the defendant in *Meyer*.  *Id*.  However, the court finds that Doe's claims are not immediately following death, as the case was in *Meyer*, because Hagar published *Red* and the statements at issue therein over twenty-two years after Dylan's death.  Thus, *Meyer* is not persuasive to the court on the instant matter.

The court finds that Hagar's conduct was not sufficiently "outrageous" to support Doe's intentional infliction of emotional distress claim.  Hagar's conduct—writing and publishing statements referencing his relationship with Doe and the death of Dylan—is not "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Suntken*, 548 N.W.2d at

168 (quoting *Harsha*, 346 N.W.2d at 801). Further, "the recitation of the facts to an average member of the community would [not] arouse his resentment against [the] actor, and lead him to exclaim, 'Outrageous!'" *Roalson*, 334 N.W.2d at 756 (quoting Restatement (Second) of Torts § 46 cmt. d). Although Hagar's statements in *Red* brought back painful memories for Doe, the evidence does not support a finding that Hagar's conduct was extreme enough to permit the court to find outrageous conduct sufficient to support Doe's intentional infliction of emotional distress claim. *See id.* ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." (quoting Restatement (Second) of Torts § 46 cmt. d)).

In addition, Doe has not provided the court with substantial evidence showing that she has suffered any emotional distress due to the publication of *Red*. Rather, "[a]ll the evidence of Doe's emotional distress claim consist[s] exclusively of [her] own conclusory statements." *Doe*, 766 N.W.2d at 795. Thus, the court finds that Doe has failed to show that Hagar's conduct was sufficiently outrageous and that she suffered emotional distress in order to support her intentional infliction of emotional distress claim. Accordingly, the court shall grant the Motion to the extent it requests that the court grant summary judgment in Hagar's favor on Count IV.

### D. Breach of Contract

In Count I of the Complaint, Doe alleges that, "[b]y publishing the false statements, . . . Hagar materially breached the terms of the [A]greement." Complaint ¶ 22. In the Brief in Support of the Motion, Hagar argues that the court should grant summary judgment in his favor with respect to Count I because Hagar did not disclose the existence of the Agreement and, thus, did not breach the terms of the Agreement. Additionally, Hagar argues that "Doe herself breached the Agreement . . . by disclosing its terms and Hagar's alleged paternity." Brief in Support of Motion at 25. Doe claims

that she did not materially breach the Agreement. She further argues that Hagar breached the confidentiality provision of the Agreement as well as the "central purpose of the Agreement," which was "to keep private the parties' affair and . . . Doe's pregnancy." Resistance at 26.

### 1. Applicable law

As stated above, the court shall apply New York law to Doe's contract claims pursuant to the choice-of-law provision in the Agreement. *See* Agreement, Doe App'x at 22. Pursuant to New York law, "[c]onstruction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007). "Further, a contract should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" *Id.* at 1213-14 (quoting *In re Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003)). "'A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.'" *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 CV 01796 (GBD), 2012 WL 3890128, *5 ( S.D.N.Y. Sept. 7, 2012) (quoting *Brad H. v. City of New York*, slip op. 5543, at *4 (N.Y. June 28, 2011)).

"'[A] motion for summary judgment may be granted in a contract dispute . . . when the contractual language . . . is found to be wholly unambiguous and to convey a definite meaning.'" *Id.* (alterations in original) (quoting *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)). "'The matter of whether the contract is ambiguous is a [threshold] question of law for the court.'" *Id.* (alteration in original) (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010)).

### 2. Application

The Agreement includes a confidentiality provision, which states that the

"Agreement and the terms thereof are . . . confidential" and Doe and Hagar "shall not cause or permit th[e] Agreement to be disclosed to any other party." Agreement, Doe App'x at 21. In *Red*, Hagar recounts his affair with Doe and states that he "hired an attorney and started dealing with [Doe]" and "Leffler convinced [Hagar] the smart thing to do was give [Doe] the money until the baby was born." *Red* excerpt, Doe App'x at 363.

The court finds that the statements in *Red* contain nothing more than a vague reference to Hagar's relationship with Doe. While the Agreement explicitly prohibits Doe from disclosing her belief that Hagar is the father of the child, the only provision in the Agreement prohibiting Hagar from disclosing anything is the confidentiality provision, which refers only to the Agreement and the terms of the Agreement—not the underlying circumstances. In addition, as discussed above, the only individuals who would understand that the statements in *Red* refer to Doe are those who had knowledge of the relationship between Doe and Hagar prior to reading *Red*. Thus, it is difficult to conceive of how the statements at issue could violate the confidentiality provision. Therefore, the court finds that Hagar did not breach the Agreement because, although the statements at issue acknowledge that Doe claimed Hagar was the father of her child and that Hagar paid Doe money while she was pregnant, Hagar did not disclose the Agreement or the terms of the Agreement. This holding does not interpret the Agreement in a way that fails to "give effect to its general purpose." *Beal Sav. Bank*, 865 N.E.2d at 1214 (quoting *Westmoreland Coal Co.*, 794 N.E.2d at 670) (internal quotation mark omitted). Accordingly, the court shall grant the Motion to the extent it requests that the court grant summary judgment in Hagar's favor on Count I.

### E. Breach of Implied Covenant of Good Faith and Fair Dealing

In Count II of the Complaint, Doe alleges that, when Hagar entered into the Agreement, he "undertook a covenant of good faith and fair dealing, which carried with it a duty . . . to protect . . . Doe's rights to receive the benefit of the [A]greement."

30

Complaint ¶ 26.  Doe goes on to allege that, "[b]y publishing the false statements, . . . Hagar committed an intentional or reckless act, which unfairly frustrated an agreed common purpose of the [A]greement . . . and disappointed the reasonable expectations of . . . Doe in connection with the [A]greement, thereby depriving her of the benefit of her bargain."  *Id.* ¶ 27.

In the Brief in Support of the Motion, Hagar argues that the court should grant summary judgment in his favor with respect to Count II because the Agreement includes an express confidentiality clause, which Hagar did not breach, and "[n]o duty can be implied that is inconsistent with that express confidentiality clause. . . . *Red* either breached the express confidentiality clause or it did not.  The implied covenant does not help Doe's claim."  Brief in Support of Motion at 26.  Doe counters that the statements at issue "surely deprived . . . Doe of the benefit of her bargain" because Doe "was entitled to believe that . . . Hagar would not disclose the existence of an agreement to pay tentative child support in order to publicly accuse her of being an extortionist."  Resistance at 28.

### 1.    *Applicable law*

Under New York contract law, there is "an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990); *see also Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (N.Y. App. Div. 1999) ("This [implied covenant of good faith and fair dealing] is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement.").  "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."  *Aventine Inv. Mgmt., Inc.*, 697 N.Y.S.2d at 130.

### 2.    *Application*

Doe argues that, when Hagar disclosed that he made payments to a "former Playboy bunny from California" who claimed that she was pregnant with Hagar's baby and referred to the situation as "extortion," *Red* excerpt, Doe App'x at 362-63, he "depriv[ed] her of the benefit of her bargain," namely, her privacy, Complaint ¶ 27.  However, Hagar did not disclose the Agreement or the terms of the Agreement—the only thing Hagar promised not to disclose under the Agreement.  Further, an individual reading *Red* would have no way of knowing that the statements at issue refer to Doe unless the individual was already aware of the relationship between Doe and Hagar.  Thus, Hagar's statements in *Red* did not compromise Doe's privacy or injure her right "to receive the fruits of the contract." *M/A-COM Sec. Corp.*, 904 F.2d at 136.  Accordingly, the court shall grant the Motion to the extent it requests that the court grant summary judgment in Hagar's favor on Count II.

## VII.   CONCLUSION

In light of the foregoing, Defendant Sammy Hagar's Motion for Summary Judgment (docket no. 86) is **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Sammy Hagar and against Plaintiff Jane Doe and to **CLOSE THIS CASE**.

**DATED** this 30th day of April, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA